**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AQILA THOMAS, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| BALA NURSING & RETIREMENT CENTER, | : | NO. 11-5771 |
| Respondents. | : | |

**OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    July 3, 2012

**I.      INTRODUCTION**

Plaintiff Aqila Thomas ("Plaintiff" or "Thomas"), a nurse practitioner and former employee of Defendant  Bala Nursing & Retirement Center, Limited Partnership ("Defendant" or "Bala"), brought this employment discrimination action against Bala on September 14, 2011.  Thomas seeks equitable and monetary relief relating to her termination by asserting violations of the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA").

Presently before the Court is Bala's Motion for Summary Judgment ("Def. Mot.") (Doc. No. 34) and accompanying Memorandum ("Def. Mem.") (Doc. No. 35), Plaintiff's Counter Statement of Material and Disputed Facts ("Pl. Statement") and accompanying Memorandum of Law ("Pl. Mem.") (Doc. No. 36) with attached deposition testimony and other exhibits ("Pl. Statement Ex."), and Defendant's reply ("Def. Reply") (Doc. No. 40).  By this motion, Defendant asserts that on the record before us there are no genuine issues of material fact and that Bala is "entitled to judgment as a matter of law" on all of its claims.

1

Upon consideration of that record, and the extensive oral argument held on June 20, 2012 ("Oral Arg.") (Doc. No. 42), and with full appreciation of the well constructed arguments set out by Defendant, we conclude, based principally upon the deposition testimony of Plaintiff, that there are indeed genuine issues of material fact.  Accordingly, we deny Defendant's motion.

## II.    FACTUAL HISTORY

### 1.    Plaintiff's Employment History

It is uncontested that Plaintiff was hired by Defendant in 2007 as a Licensed Nurse Practitioner ("LPN") and charge nurse.  (Pl. Statement Ex. A at 16, 23.)[1]  In this capacity, her duties included administering medication, ensuring resident safety, directing the certified nursing assistants, doing treatments and assessments, and resolving problems with residents' families.  (*Id.* Ex. B at 16-17.)[2]  On February 22, 2011, Plaintiff was terminated by Defendant.  (*Id.* Ex. S.)[3]  Following her termination, on March 4, 2011, she participated in a grievance hearing held regarding her termination.  (Thomas Dep. at 142-143.)

Plaintiff was directly supervised by Brenda Williams from November 29, 2010 until her termination.  (Williams Dep. at 14.)  Ms. Williams reported to Judith Sherman, the Director of Nursing ("DON"), and Connie Singletary, the Assistant Director of Nursing ("ADON").  (*Id.* at Ex.

---

[1] Hereinafter, Exhibit A of Plaintiff's Statement, or Aqila Thomas' deposition testimony, will be referred to as "Thomas Dep."

[2] Hereinafter, Exhibit B of Plaintiff's Statement, or Brenda Williams' deposition testimony, will be referred to as "Williams Dep."

[3] Hereinafter, Exhibit S of Plaintiff's Statement, or Thomas's termination paperwork, will be referred to as "Term. Notice."

C at 17-18, Ex. D at 14-15.)[4] Marjorie Zeigler was the Nursing Home Administrator. (Pl. Statement Ex. E at 12.)[5]

Both parties agree that tardiness factored into Bala's decision to terminate Thomas.[6] (Term. Notice.) Indeed, the question of tardiness is central to this case. At the time of Thomas's hire, Bala had in place a tardiness policy that allowed for a seven minute "grace period," by which an employee would not be counted as tardy so long as she arrived within seven minutes of her scheduled start time. (Ziegler Dep. at 19.) Bala asserts that it instituted a new tardiness policy in April 2010. (*Id.*) This new policy effectively eliminated the seven minute grace period. (*Id.*) Bala contends that notices were placed around the office regarding the change. (*Id.* at 20; Sherman Dep. at 92.) Plaintiff, claiming to rely upon an office memorandum, asserts that the grace period was not removed until January 5, 2011, just six weeks prior to her termination. (Pl. Statement Ex. U) (Memorandum stating "[t]his is a *reminder* to all Employees of Bala Nursing & Retirement Center's Attendance policy.") (emphasis added). Thomas contends that there is a factual dispute as to when the new tardiness policy was instituted.

It is uncontested that Plaintiff often arrived late for her shift, which began at 11:00 p.m.

---

[4] Hereinafter, Exhibit C of Plaintiff's Statement, or Connie Singletary's deposition testimony, will be referred to as "Singletary Dep.," and Exhibit D of Plaintiff's Statement, or Judith Sherman's deposition testimony, will be referred to as "Sherman Dep."

[5] Hereinafter, Exhibit E of Plaintiff's Statement, or Marjorie Ziegler's deposition testimony, will be referred to as "Ziegler Dep."

[6] While the parties agree that tardiness factored into the decision to terminate, they diverge on whether the tardiness should be excused due to Plaintiff's anemia. Furthermore, Plaintiff alleges that FMLA qualified absences were taken into account by the Defendant in its decision to terminate. (Ziegler Dep. at 40.) Defendant says it considered only the unexcused tardiness. (Singletary Dep. at 26.)

(Thomas Dep. at 22), although her tardiness was usually for fewer than ten minutes.  (*Id.* at 84-89.) The reason for this tardiness is highly contested.  Defendant asserts that Plaintiff has offered no plausible justifiable excuse.  (*Id.* at 42-43.)  Plaintiff asserts, to the contrary, that every tardy she received was due to her anemia.  (*Id.* at 35.)

### 2.   **Plaintiff's Anemia**

The parties agree that Plaintiff was diagnosed with iron deficiency anemia in August of 2008. (*Id.* Ex. W.)  From that date through February 24, 2011, she was treated for the anemia by Dr. Ingrid Kohut, a hemotologist.  (Thomas Dep. at 25.)  Dr. Kohut administered intravenous ("IV") iron infusions to Plaintiff on an outpatient basis some thirteen times between April 23, 2008, and February 24, 2011.  (Pl. Statement Ex. I at 13.)[7]

Plaintiff contends that her anemia affected her ability to stand for a long period of time, occasionally limited her ability to think or concentrate, caused shortness of breath when she would walk fast or run, and caused her to sleep up to twelve hours per day.  (Thomas Dep. at 68, 71, 187.) Dr. Kohut has testified that a person with iron deficiency anemia could suffer from fatigue.  (Kohut Dep. at 36.)  Defendant in turn highlights Dr. Kohut's testimony that Plaintiff would only get tired towards the end of the day.  (*Id.* at 39.)

Plaintiff asserts that in her last few months of employment with Bala, her anemia-related fatigue worsened.  (Thomas Dep. at 70.)  Bala refutes this assertion, noting that Plaintiff had scheduled no appointments with Dr. Kohut during this time period.  (Def. Reply at 15-16.)  Further, Bala argues that Plaintiff worked multiple double shifts and overtimes during the relevant time

---

[7] Hereinafter, Exhibit I of Plaintiff's Statement, or Dr. Ingrid Kohut's deposition testimony, will be referred to as "Kohut Dep."

period, which would not typically be indicative of extreme fatigue.  (Thomas Dep. at 16.)

In December 2010, Plaintiff requested and received a transfer to the night shift due to the fact that she had more seniority than other applicants.  (*See, e.g.*, Sherman Dep. at 27-28.)  Plaintiff asserts that this was and should be considered an "accommodation" under the ADA and was due to the fatigue brought on by her anemia.  (Thomas Dep. at 30-31.)  Defendant contends that there is no evidence to support Plaintiff's assertion that this request was made seeking an "accommodation," but rather that Plaintiff simply signed up for a different shift change that was listed for all employees, and that the only reason she requested the change was because the work is less strenuous.  (*Id*. at 68-69.)

It is uncontested that February 24, 2011, after being terminated, Plaintiff complained to Dr. Kohut that she was having difficulty performing her job duties.  (Kohut Dep. at 29.)  Defendant argues, however, that Plaintiff had not complained of fatigue to Dr. Kohut between her April 2010 treatment and her February 2011 termination.  (*Id.* at 26-31.)

**3.      Defendant's Notice of Plaintiff's Condition**

Thomas alleges that she repeatedly informed Ms. Williams, Ms. Sherman, and Ms. Singletary that she had anemia.  **(**Thomas Dep. at 28-29, 66-67, 195-199.)  This is a highly disputed fact as Defendant states that Plaintiff never informed any of her supervisors of this condition.  (Williams Dep. at 24; Singletary Dep. at 34-35; Sherman Dep. at 22.)

The parties agree that Bala maintains a written policy for employee leave under the FMLA. (Pl. Statement Ex. G.)  Under this policy, employees can request leave from supervisors, the administrator, or the DON.  (Sherman Dep. at 12.)  Plaintiff alleges that she told Ms. Sherman about her anemia, and Ms. Sherman did not inform her of her FMLA rights.  (Thomas Dep. at 198.)  In

5

December 2010, however, Plaintiff requested and received FMLA paperwork from Bala's Human Resources Department.  (*Id.* at 124.)

The parties also agree that from January 3 to 12, 2011, Plaintiff was on medical leave.[8] (Thomas Dep. at 36, 129.)  She asserts that she was on leave due to the flu and her anemia.  (*Id.*)  Defendant, however, asserts that the leave was strictly for the flu, was unrelated to Plaintiff's anemia, and therefore not FMLA qualified.  (*Id.* at 58, 122.)  Plaintiff testified that during this leave, she informed Ms. Sherman during a telephone call that she would provide the FMLA paperwork when she returned to work on January 13, 2011.  (*Id.* at 58.)  Although this is not directly articulated, Defendant seems to state that there was no discussion about the FMLA while Plaintiff was on leave.  It is uncontested, however, that the FMLA paperwork was signed by Dr. Kohut's office on January 7, 2011.  (Pl. Statement Ex. M.)[9]

Plaintiff alleges that she placed the FMLA Certification form in Ms. Sherman's mailbox in the reception area at Bala when she returned to work on January 13, 2011.  (Thomas Dep. at 129-130.)  Ms. Sherman testified that she checks her mailbox at least a couple of times per day, that no FMLA forms were found in the mailbox, and that the first time they were seen by anyone at Bala was at the March 4, 2011 grievance hearing.  (Sherman Dep. at 66-73; Ziegler Dep. at 62-64.)  Furthermore, Defendant argues that the FMLA paperwork asked only for intermittent leave in connection with IV treatments Plaintiff required for her anemia, and that it made no mention of a

---

[8] Defendant's Memorandum states that Plaintiff was on leave "in January 2011," but does not provide specific dates. Defendant, however, cites only to Plaintiff's deposition, which makes clear that these are the dates during which Plaintiff was on leave.

[9] Hereinafter, Exhibit M of Plaintiff's Statement, or the FMLA paperwork turned in by Plaintiff, will be referred to as "FMLA Cert."

need for tardiness or any other such accommodation.  (FMLA Cert.)  Plaintiff's counsel concedes

that the forms ask only for intermittent leave, but asserts that intermittent leave includes arriving to

work late.  (Oral Arg.)

Plaintiff further testified that in January 2011, she requested from Ms. Sherman and staffing

coordinator Lamia Johnson that her hours be reduced from 80 hours to 64 hours per week, and that

this request was denied.  (Thomas Dep. at 48, 50-51, 172-173, 181.)  Plaintiff also asserts that she

verbally requested medical leave in January 2011, due to her anemia, but Ms. Sherman denied that

request and told her that she would have to wait until April.  (*Id.* at 30, 52-55, 181-182.)  These

contested assertions are supported principally by Plaintiff's own testimony.

Prior to terminating Plaintiff, Ms. Sherman, Ms. Singletary, and Ms. Ziegler reviewed

Plaintiff's personnel file, which Plaintiff contends typically would contain doctor's notes and FMLA

paperwork.  (*Id.* at 113-114.)  Plaintiff also contends that absences were taken into account when

determining whether to terminate her, and that the decision was based upon more than tardiness.[10]

(Term. Notice.)  Finally, Plaintiff asserts that her job performance was consistently compromised

by the fatigue she experienced as a result of her anemia, which caused her to feel more tired than

would the average individual.  (Kohut Dep. at 38-39.)  Defendant states, however, that until the

March grievance hearing after her termination, only Plaintiff's tardiness was reviewed, and that Bala

had no knowledge of her FMLA paperwork.  (Ziegler Dep. at 62, 64; Sherman Dep. at 66-68;

Singletary Dep. at 62.)  Defendant also makes it clear that Plaintiff had no performance related issues

---

[10] Plaintiff asserts several, if not all of, the absences taken into account were FMLA qualifying. For instance, Plaintiff alleges that on January 19, 2011, she received a verbal counseling for absenteeism on dates for which she was on FMLA-qualified leave for the flu and anemia.  (Pl. Statement Ex. Q.)

and it was only tardiness that led to her termination.  (Def. Reply at 7.)

### 4.    Tardiness History

To enforce its tardiness policy, Bala maintains a process of gradual discipline that is invoked when an employee is tardy three times within a pay period.  (Thomas Dep. at 23.)  Plaintiff asserts that she received her first disciplinary sanction, a verbal counseling, on August 5, 2010.  (Pl. Statement Ex. N.)  Defendant asserts that the verbal warning occurred in July 2010.  (Thomas Dep. at 75.)  It is uncontested that the second step in the disciplinary process for tardiness, a written counseling, was given to Plaintiff on December 6, 2010.  (Pl. Statement Ex. O.)  Despite its policy, Plaintiff was given a second written warning for tardiness on January 6, 2011.[11]  (*Id.* at Ex. P.)  On January 25, 2011, the third step in the disciplinary process, a one-day unpaid suspension, was issued to Plaintiff.  (*Id.* Ex. R.)

Defendant alleges that upon receipt of these disciplinary actions, Plaintiff never asked her supervisors to excuse her lateness due to her anemia, nor did she submit medical documents indicating that it should be excused.[12]  (Thomas Dep. at 29, 47.)  Defendant claims that Plaintiff refused to speak to Ms. Sherman about any medical problems that may have been causing her to be late.  (*Id.* at 80-81; Singletary Dep. at 31-32; Sherman Dep. at 40-41.)  Thomas, on the other hand, alleges that she repeatedly informed Ms. Williams, Ms. Sherman, and Ms. Singletary that she had anemia, and that she was late to work as a result.  (Thomas Dep. at 28-29, 66-67, 195-199.)  Plaintiff

---

[11] Defendant's policy states that employees are to be given only one written counseling. The disciplinary action also falls during the time Plaintiff claims to have been on medical leave for the flu and anemia.

[12] Defendant specifically claims that Plaintiff did not tell Williams about her anemia when she received her written counseling on January 6, 2011.  (Williams Dep. at 33-36.)

also asserts that she specifically requested to be permitted to arrive late to work occasionally due to her anemia.[13]  The record thus demonstrates a significant factual dispute over what communications took place between Plaintiff and her supervisors as well as when they may have occurred.

### III.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that, if accepted, "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

In a summary judgment analysis, "[t]he moving party has the initial burden of demonstrating that no genuine issue of material fact exists." *Josey v. John R. Hollingsworth, Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). After the initial burden is met, "the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial." *Id.* (citing *Celotex Corp.*, 477 U.S. at 324).  When deciding whether there is a genuine issue for trial, "the inferences drawn from the underlying facts in the materials must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S.

---

[13] After reading the deposition transcript, specifically the portions cited by Plaintiff's counsel that allegedly support this contention, we observe that Thomas noted on her EEOC form that she "occasionally would need to arrive to work late." (Pl. Statement Ex. J.)  When questioned directly as to her memory of requesting an accommodation, however, she stated, "I don't remember." (Thomas Dep. at 179.)  Thomas also stated she *believed* she should be excused from latenesses because anemia is "a health condition and [she] should be accommodated."  (*Id.* at 77.)

654, 655 (1962). While the inferences are viewed in "the light most favorable" to the nonmoving

party, they "must do more than show there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, where

"reasonable minds can differ as to the import of proffered evidence that speaks to an issue of

material fact, summary judgment should not be granted."  *Gelover v. Lockheed Martin*, 971 F.Supp.

180, 181 (E.D. Pa. 1997).

## IV.      DISCUSSION

### 1.      ADA Discrimination and PHRA Claims

Plaintiff has alleged discrimination under both the Americans with Disabilities Act ("ADA")

and the Pennsylvania Human Relations Act ("PHRA").  In order to establish a *prima facie* case of

discrimination under the ADA, a plaintiff must show that: (1) she is a disabled person within the

meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with

or without reasonable accommodations by the employer; and (3) she has suffered an adverse

employment decision as a result of the discrimination.  *Gual v. Lucent Tech.*, 134 F.3d 576, 580 (3d

Cir. 1998).  The PHRA is "basically the same as the ADA in all relevant aspects."  *Rinehimer v.*

*Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 106 (3d

Cir. 1996)).  Our disposition of Plaintiff's ADA claim therefore applies with equal force to her

PHRA claim.

Furthermore, the *McDonnell Douglas* burden shifting framework applies to ADA

discrimination claims.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See also*

*Walton v. Mental Health Ass'n. of Southeastern Pennsylvania*, 168 F.3d 661 (3d Cir. 1999).  Under

the *McDonnell Douglas* framework, after a plaintiff proves a *prima facie* case of discrimination by

10

demonstrating the first three factors, the burden shifts to the defendant to show a nondiscriminatory reason for the termination, or other adverse employment decision. *Id*. at 668. After the defendant articulates a nondiscriminatory reason, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Gelover*, 971 F.Supp. at 184 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Both parties agree that there was an adverse employment decision in the form of Plaintiff's termination from employment. Similarly, there is no serious question about whether she was "otherwise qualified to perform the essential functions" of her job. Defendant asserts, however, that she was not in fact disabled and that even if she was, she did not properly provide Defendant with notice such as to trigger Defendant's obligations under either the ADA or FMLA. Bala also asserts that it had a legitimate rationale for Thomas's termination predicated upon her excessive tardiness, which it alleges that Plaintiff cannot show is pretextual.

### a.    Disabled Person Under ADA

A plaintiff qualifies as disabled for the purposes of the ADA if she: "(1) has a physical or mental impairment that substantially limits one or more of h[er] major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Keyes v. Catholic Charities of the Archdiocese of Phila.*, 415 Fed.Appx. 405, 409 (3d Cir. 2011) (citing 42 U.S.C. § 12102(2)).

Defendant concedes that Plaintiff has a physical impairment in the form of anemia, and

11

therefore we must determine only whether it substantially limited a major life activity.  For purposes of this motion, we conclude that Plaintiff has set out testimony in her deposition that is sufficient to demonstrate a substantial limitation to a major life activity caused by her physical impairment. In that we conclude that for purposes of summary judgment Plaintiff is substantially limited in a major life activity, we need not consider the alternate argument that she is "regarded as having such an impairment."

This Court recognizes the mandate to expand ADA coverage that was codified under the ADA Amendments Act of 2008 ("ADAAA").  In enacting the ADAAA, Congress expressly rejected the standard that had been embraced by courts stating that "the terms 'substantially' and 'major' in the definition of the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled.'"  Pub. L. 110-325 § 2(b)(4).  Congress stated that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* at § 2(b)(5).

Plaintiff alleges that she is substantially limited in: (1) standing; (2) walking; (3) concentrating; (4) sleeping; and (5) breathing.  (Pl. Mem. at 27.)  Plaintiff testified that her fatigue limited her ability to stand for a long period of time, and that it would cause shortness of breath or fast breathing when she walked quickly.  (Thomas Dep. at 68, 71.)  Plaintiff also testified that she slept for twelve hours per day.  (*Id.* at 187.)

We acknowledge Defendant's argument that occasional fatigue does not substantially limit a major life activity.  The cases that Defendant cites as support, however, all take place before the ADAAA, and therefore apply a more rigorous interpretation of what counts as a "substantial limitation."  *See Estate of Murray v. UHS of Fairmount, Inc.*, Civ. A. No. 10-2561, 2011 WL

5449364, *8 (E.D. Pa. Nov. 10, 2011) (acknowledging an "incredibly sparse" record as to whether the employee's impairment substantially limited her major life activities but declining to grant summary judgment in light of the ADAAA).  Since we must take into consideration the lesser threshold announced by the ADAAA, we cannot grant summary judgment based on Plaintiff being substantially limited in a major life activity.[14]

### b.    Otherwise Qualified for the Job

An individual is otherwise qualified if she, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Defendant maintains that tardiness was the sole reason for Plaintiff's termination, and that there were not any performance related issues.  (Def. Reply at 7.)  Defendant does not challenge whether Plaintiff was otherwise qualified for the job. Therefore, this element does not provide a basis for granting summary judgment.

### c.    Adverse Employment Action

It is not disputed that Plaintiff suffered an adverse employment action in the form of her termination on February 22, 2011.

---

[14] We acknowledge Defendant's contention at oral argument that the major life activity should be characterized as "waking up" instead of "sleeping," and that sleeping longer than the average individual is hardly a substantial *limitation* for sleeping.  (Oral Arg.)  However, at this time we cannot say as a matter of law that "waking up" is not a major life activity.  The Third Circuit has characterized a major life activity as one that is "inescapably central to anyone's life." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 307 (3d Cir. 1999) (finding "thinking" to be a major life activity because it is "inescapably central to anyone's life").  If sleeping meets this standard, then it is hard to see how the opposite (waking up) would fail to.  Furthermore, even if we were to classify the major life activity as "waking up," we could not say that it was not substantially limited for the same reasons given for "sleeping."

13

### d. Pretext

ADA discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework. *Walton v. Mental Health Ass'n. of Southeastern Pennsylvania*, 168 F.3d 661 (3d Cir. 1999). Here, Defendant asserts that it terminated Plaintiff exclusively for tardiness, a legitimate business reason. At oral argument, counsel for Plaintiff did not dispute that Thomas was fired for tardiness. She claims, however, that Plaintiff had informed her supervisors prior to her termination that she suffered from anemia, which caused her lateness. (Thomas Dep. at 28-29, 66-67, 195-196, 197-199.) Viewing Plaintiff's deposition testimony in the light most favorable to her, as we must for summary judgment purposes, a factfinder could reasonably conclude that the graduated discipline imposed on Plaintiff for tardiness, culminating in her termination, after she had informed Defendant she was tardy due to her anemia, demonstrates that tardiness was used as a pretext for discriminating against her on the basis of her anemia.

We note that counsel for Defendant vigorously advocated in his filings and at oral argument that the discipline began before Plaintiff asked for a reasonable accommodation or turned in her FMLA paperwork. This argument, however, ignores Plaintiff's testimony that she told her supervisor about her anemia immediately upon its diagnosis, and that the anemia brought on fatigue leading directly to her tardiness. (*Id.* at 28-29.) Thus, we are left to conclude that there is a genuine issue of material fact on this central question. Plaintiff's ADA discrimination claim survives summary judgment.

### 2. Plaintiff's Failure to Accommodate Claim

In addition to her claim that her termination was discriminatory, Plaintiff also presents a failure to accommodate claim. An employer commits unlawful discrimination under the ADA if it

14

does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."   42 U.S.C. § 12112(b)(5)(A).   A "reasonable accommodation" may involve an "'employer's reasonable efforts to assist the employee and to communicate with the employee in good faith….'"   *Colewell v. Rite Aid Corp.,* 602 F.3d 495, 504 (3d Cir. 2010);   *See also Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 311 (3d Cir. 1999) (quoting 29 C.F.R. § 1630.2(o)(3) for the proposition that "'[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation.   This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.'").

Both parties agree that no such interactive process occurred in this case, and that Defendants did not attempt to engage in developing or providing a reasonable accommodation.[15]   For the purpose of determining whether this aspect of Plaintiff's ADA claim survives summary judgment, it is relevant only that Defendant did not, in fact, provide such an accommodation.   Accordingly, we proceed to address whether Defendant was put on sufficient notice to have initiated the interactive process.

---

[15] Although Plaintiff did receive the switch she requested to the night shift, both parties seem to agree that this was not an accommodation, but rather reflected an employee's request for an alternative work schedule that was granted based on seniority.

15

### a.    Notice of Necessity of Accommodation

In the Third Circuit, an employer need only "know of both the disability and the employee's desire for accommodations for that disability" in order to be on notice that the employee seeks a reasonable accommodation.  *Taylor*, 184 F.3d at 313.  In other words,

> [w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.

*Id.*  Plaintiff alleges that she told all of her supervisors about her anemia and that it caused her to be late to work.  (Thomas Dep. at 28-29, 66-67, 195-196, 197-199.)  Defendant alleges that no such request for a reasonable accommodation was ever explicitly, or even implicitly made.

We appreciate Defendant's contention that while there may be some evidence in the record that Plaintiff made a request for a reasonable accommodation, that request was neither clearly nor consistently articulated.  (*See* Oral Arg.)  Specifically, we take note of Defendant's position that Plaintiff herself never made an explicit request that she be allowed to arrive at work late to accommodate her anemia,[16] that Plaintiff failed to provide medical evidence that she required such an accommodation, and that habitual lateness by a few minutes would not in and of itself provide constructive notice that illness-related fatigue was at the root of the issue (as might, for example, consistent lateness of the magnitude of an hour or two).  (*Id.*)  We specifically note Defendant's

---

[16] At the June 20 oral argument, defense counsel characterized Plaintiff's deposition testimony to be that she "could not remember" whether she had ever discussed with her supervisors that her anemia required her to arrive late to work, whereas several supervisors testified clearly and unequivocally that no such discussion ever occurred, or that no such request was ever made.  (Oral Arg.)  Our review of the deposition transcripts, however, reveals that Plaintiff states that she "explained [her] health condition [to Brenda Williams]. . . and [said] that was the reason why [she] was late."  (Thomas Dep. at 109-110.)

16

citation to Dr. Kohut's testimony stating that she did not tell Thomas to go into work late.  (Kohut Dep. at 40.)

At her deposition, however, Plaintiff testified that in reference to a disciplinary warning she "explained [her] health condition, that [she] was fatigued and that was the reason why [she] was late."  (Thomas Dep. at 109-110.)  Furthermore, Plaintiff testified that she informed her supervisors about her condition and that it was causing her to be late to work on multiple occasions.  (*Id*. at 28-29, 66-67, 195-199.)  Viewing the evidence in the light most favorable to Plaintiff, as the summary judgment standard requires us to do, we conclude that there is a genuine issue of material fact as to whether Defendant was put on notice of Plaintiff's need for an accommodation.

### b.      Reasonableness of Accommodation

An employer need not accommodate an employee if it "can demonstrate that the accommodation would impose an undue hardship on [its] operation of the business."  *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 608 (3d Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)). We conclude that it is a question of fact whether accommodating Plaintiff would impose an undue hardship on Defendant, and therefore summary judgment cannot be granted based on the accommodation being unreasonable.

We acknowledge Defendant's position that, even if it had appreciated that Plaintiff was communicating a connection between her anemia and her tardiness, that constructing a reasonable accommodation for tardiness at a nursing home would be problematic.  In *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1235 (9th Cir. 2012), the plaintiff, Samper, was a nurse at a neo-natal intensive care unit ("NICU") who was diagnosed with fibromyalgia.  Samper asked for an accommodation that would allow for her to have an unspecified amount of unplanned absences.  *Id.*

The Ninth Circuit found that it would be an unreasonable accommodation to allow an employee to "simply miss work whenever she felt she needed to and apparently for so long as she felt she needed to." *Id.* at 1240 (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999). We appreciate that there may be some similarity with that case in that both arise from the health field. We would be hard pressed, however, to equate a nurse in a neonatal intensive care unit with an LPN at a nursing home.[17] More importantly, in the case before us, the interactive process never took place so we simply do not know what might have emerged from it.[18]

While the record does not seem to indicate that Plaintiff asked for a specific accommodation, we are unable to conclude that one might not exist where no interactive process was ever engaged in to determine what such an accommodation would be. We therefore conclude that it is a question of fact whether forgiving Plaintiff's tardiness would be a reasonable accommodation.

### 3. ADA Retaliation Claim

Thomas's final claim under the ADA is that she was retaliated against for seeking an ADA accommodation. To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) engagement by the employee in protected activity; (2) adverse action taken by the employer either after, or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). As discussed above, there is no dispute as to

---

[17] The *Samper* opinion notes specifically that "NICU nurses require special training such that the universe of nurses that can be called in at the last minute is limited." 675 F.3d at 1235. We have not been given any similar information about how Bala would be burdened by accommodating Plaintiff's condition.

[18] Samper was asking to have all of her unplanned absences accommodated, whereas Thomas asked only that her tardiness, usually consisting of a few minutes, be accommodated.

whether Plaintiff suffered an adverse action taken by Defendant in the form of her termination. Furthermore, the pretext analysis we engaged in above to decide Plaintiff's ADA discrimination claim applies with equal force to her ADA retaliation claim. Therefore, we limit our review of this claim to determining whether Plaintiff engaged in a protected activity and whether there was a causal relationship between that activity and her termination.

In that we must view the record before us in the light most favorable to Plaintiff, there is certainly some evidence that suggests that she engaged in the protected activity of requesting an accommodation and we are unable to conclude as a matter of law that there is no causal connection between the protected activity and her termination. Accordingly, the ADA retaliation claim survives summary judgment.

### a.    Protected Activity

Requesting a reasonable accommodation for a disability constitutes a protected employee activity for the purposes of an ADA retaliation claim. *See Williams v. Phila. Housing Auth. Police Dept.,* 380 F.3d 751, 761 (3d Cir. 2004) (holding that Plaintiff had failed to make out a *prima facie* case of retaliation due to insufficient causal link between protected activity of requesting accommodation and his termination). Furthermore, a plaintiff need not be "disabled" within the meaning of the ADA to make a claim of retaliation for seeking an accommodation, but instead must show only that "she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested." *Id.* at 759 n.2.

Plaintiff testified at her deposition that she asked to reduce her hours from eighty to sixty-four hours per week. (Thomas Dep. at 48, 50-51, 172-173, 181.) Plaintiff also stated that she had repeatedly told her supervisors about her anemia and that it was causing her to be late to work. (*Id.*

19

at 28-29, 66-67, 195-199.)  Finally, she testified that on January 13, 2011 she turned in FMLA paperwork requesting intermittent leave due to her anemia.  (*Id.* at 129-130.)  We conclude that the record, without considering the credibility of its sources, is sufficient to create a genuine issue of material fact as to whether Plaintiff engaged in a protected activity in the form of requesting an accommodation.

   b.  **Causal Link**

   In order to establish a claim for ADA retaliation, a plaintiff must be able to show a linkage between the protected activity and the adverse employment decision.  Typically a causal link can be demonstrated through either temporal proximity or ongoing antagonism.  *Krouse v. American Sterilizer Co*., 126 F.3d 494, 503-504 (3d Cir. 1997) (stating that "[w]hen temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to intervening period for other evidence of retaliatory conduct").  Where a plaintiff seeks to establish a causal link through temporal proximity, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Krouse*, 126 F.3d at 503; *see also Shellenberger v. Summit Bancorp*, *Inc.*, 318 F.3d 183 (3d Cir. 2003).  The cases do not, however, establish a specific bright line test as to what amount of time may pass between the protected activity and the retaliation.  *Compare Shellenberger*, 318 F.3d at 188-189 (finding that termination two months after EEOC complaint was sufficient to establish causal connection for summary judgment when supervisor made comments related to legal action ten days before termination) and *Williams,* 380 F.3d at 760 (finding that two months between request for accommodation and termination was not close enough to establish causal link).  Ultimately, "our cases set no parameters but were decided in the context of the particular circumstances before us."

20

*Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) (concerning a causal connection analysis in a Title VII case).

Here, Plaintiff testified at her deposition that she had asked for a reasonable accommodation in the form of a reduced work schedule in January 2011, roughly one month before she was terminated.  (Thomas Dep. at 48, 50-51, 172-173, 181.)  Additionally, a relatively short period of time—some forty days—passed between when she testified that she turned in her FMLA paperwork on January 13, 2011, and her termination.  Lastly, Plaintiff stated that she told Defendant that she was late because of her illness, which arguably put Defendant on notice of a need to initiate a discussion with Plaintiff about accommodation.  (*Id.* at 28-29, 66-67, 195-196, 197-199.)

In the light most favorable to Plaintiff, the evidence demonstrates that she performed at least one ADA protected act in January 2011, requesting a reduced schedule,[19] which is less than two months before she was terminated on February 22, 2011.  Mindful of the summary judgment standard, we are unable to conclude that a jury could not find the time frame to be sufficiently abbreviated as to infer a causal connection.  In light of this conclusion, we need not consider whether there was ongoing antagonism.[20]  Therefore, Plaintiff's ADA retaliation claim survives summary judgment.

---

[19] Plaintiff's deposition does not give a specific date for when she requested a change in hours, so we do not know when in January this request was made.

[20] Although not dispositive to our analysis, we observe that the only example of "antagonism" offered by Thomas is that at some point one of her supervisors made a comment "while grinning at her and speaking in a disparaging tone [. . .,] that 'people need to arrive at work on time, especially a nurse.'" (Thomas Dep. at 177.)  Assuming that the comment is an example of antagonism, it hardly demonstrates *ongoing* antagonism.  Instead, it shows only one isolated instance with no direct reference to a requested accommodation.

### c.      Pretext

An ADA retaliation claim is subject to the *McDonnell Douglas* burden-shifting framework. *See, supra, Krouse*, 126 F.3d 494.  The pretext analysis under an ADA retaliation claim is essentially the same as that for an ADA discrimination claim, which we have outlined above.  As we have discussed in the context of the discrimination claim, we conclude that there is a genuine issue of material fact that precludes summary judgment.

### 4.      FMLA Interference

In addition to her ADA claims, Plaintiff has brought claims for interference and retaliation under the FMLA.  To make out an FMLA interference claim,[21] an employee need only show that she was entitled to benefits and that she was denied them.  *See Callison v. Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).  Specifically, a plaintiff must show that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice to the employer of her intention to take FMLA leave; and (5) she was denied benefits to which she was entitled under the FMLA.  *Atchison v. Sears*, 666 F.Supp.2d 477, 488 (E.D. Pa. 2009).

---

[21] The Third Circuit has held that when a plaintiff argues interference when her employer took an adverse employment action because of requested FMLA leave, the interference claim should be examined as a retaliation claim only.  *Conoshenti v. Pub Serv. Elec. & Gas Co.*, 364 F.3d 135 (3d Cir. 2004); *See also Atchison v. Sears*, 666 F.Supp.2d 477, 489 (E.D. Pa. 2009). The court was concerned that analyzing the claim as FMLA interference would allow a plaintiff to sidestep the *McDonnell Douglas* burden-shifting framework.  *Id.*

We note at the outset that it is uncontested that (1) Plaintiff is an eligible employee,[22] that (2) Defendant is an employer subject to FMLA requirements,[23] and that (3) Plaintiff was entitled to take FMLA leave due to a serious health condition (anemia).[24]   Therefore, it is necessary to determine only whether Plaintiff gave notice to Defendant of her intention to take FMLA leave, and whether she was denied benefits to which she was entitled. As we set out below and with respect to the question of interference, we consider Plaintiff's testimony that she asked for FMLA leave in January 2011, and that she was told she would have to wait until April.  (Thomas Dep. at 30, 52-53, 181-182.)  When the record is viewed in the light most favorable to Plaintiff, we conclude that there is a genuine issue of material fact in dispute and that dismissal of the claim would be inappropriate.[25]

### a.      Notice of Request for FMLA Leave

In providing notice to an employer of a need for FMLA leave, an "employee need not use any magic words." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2011).  It is not

---

[22] 29 U.S.C. § 2611(2)(A) states that an eligible employee is one who "has been employed (i) for at least 12 months by the employer. . . and (ii) for at least 1,250 hours of service with such employer during the previous twelve month period."  At the time of her termination, Plaintiff had been employed by Defendant for over twelve months, and had at least 1,250 hours of service during the previous twelve month period, thereby satisfying the statutory requirements.

[23] 29 U.S.C. § 2611(4)(A)(i) states that an employer is subject to FMLA requirements if it "employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  Defendant has stated that it employs two-hundred individuals, which is above the number of employees required.

[24] 29 U.S.C. § 2611(11) states that a "serious health condition" includes an illness "that involves (A) inpatient care. . . or (B) continuing treatment by a health care provider." From April 2008 through February 2011, Plaintiff was treated for anemia on a continuing basis by Dr. Kohut, which is sufficient to satisfy the requirements of "continuous treatment."

[25] Plaintiff also alleges failure to advise and interference by counting the "FMLA-qualifying" tardiness against her.  We need not address these allegations as we conclude that Plaintiff has sufficiently made out an FMLA interference claim to withstand summary judgment with regards to her request for leave in January.

necessary that an employee "give his employer a formal written request for anticipated leave, [because] [s]imple verbal notification is sufficient." *Id.* Furthermore, "[a]n employee who does not cite to the FMLA or provide the exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances." *Id.*

Plaintiff testified at her deposition that in January 2011, she requested to take medical leave due to her anemia.[26] (Thomas Dep. at 30, 52-56, 181-182.) She stated that she made this request to Ms. Sherman. (*Id.*) Plaintiff further testified that, during a hallway conversation at Bala, she did not tell Ms. Sherman how long she would need to be on leave. (*Id.* at 55.) Even though Plaintiff testified that she did not include a specific duration for the verbal medical leave request, we conclude that a jury could find that sufficient "reasonably adequate" information had been provided by Plaintiff to put Defendant on notice of her request for FMLA leave. *See Sarnowski,* 510 F.3d at 402; *see also* 29 C.F.R. § 825.300(b)(1) (stating "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances*). Accordingly, we cannot say that Plaintiff's FMLA interference claim fails as a matter of law due to lack of notice of requested FMLA leave.

### b.    Denied Benefit

An employer is prohibited from "interfer[ing] with, restrain[ing], or deny[ing] the exercise or the attempt to exercise [FMLA rights]." 29 U.S.C. § 2615(a)(1). There is support for the proposition that telling an employee to take leave at a different time than was requested constitutes

---

[26] Plaintiff claims that this request was separate from the week off she requested, and received, for treatment of the flu.

24

interference with FMLA protected rights.[27]  *See Williams v. Shenango, Inc.*, 986 F.Supp. 309, 320-321 (W.D. Pa. 1997) (finding that the denial of an FMLA qualifying leave and suggestion that it be taken a week later could be construed as interference).

Plaintiff testified at her deposition that when she requested medical leave for her anemia in January 2011, she was told that she would have to wait until April.  (Thomas Dep. at 54.)  Viewing the facts in the light most favorable to Plaintiff, as we must for purposes of summary judgment, we conclude that a reasonable jury could find that a denial of medical leave and suggestion that it could only be used three months later could be construed as "interfering with" her FMLA rights. Accordingly, we are unable to grant summary judgment on the FMLA interference claim.

### 5.    Plaintiff's FMLA Retaliation Claim

To make out a successful FMLA retaliation claim, a plaintiff must show that 1) she took or requested to take FMLA leave; 2) she suffered an adverse employment decision; and 3) the adverse employment decision was causally related to her FMLA leave.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).  *See also Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).    Where there is only indirect evidence of a violation of FMLA, the *McDonnell Douglas* burden-shifting framework applies.  *Atchison v. Sears*, 666 F.Supp.2d 477, 490 (E.D. Pa. 2009).

---

[27] We note that the FMLA certification form that Plaintiff allegedly submitted on January 13, 2011, does not appear to request "intermittent leave" in the form of tardiness.  When the form is viewed as a whole, it seems to merely request that Plaintiff be excused on days where she required IV infusions.  Since Plaintiff had no appointments with Dr. Kohut for IV infusions between the submission of the form on January 13, 2011 and her termination on February 22, 2011, we would find it difficult to conclude that the rights sought in this request had been abridged.  This does not speak to the benefit Plaintiff claims she requested when she had conversations with her supervisors.

The question here is whether there is sufficient evidence that Plaintiff sought FMLA leave,[28] and whether the evidence supports a causal link between such a request and her termination. In that we determine that Plaintiff has presented enough evidence to get to a jury on these questions, and that we have already determined that Bala has met its burden of presenting a legitimate business reason for her termination with the proffered justification of Plaintiff's tardiness, we next must also decide whether Plaintff could demonstrate that this rationale was merely pretext. For purposes of this summary judgment analysis, and based on the reasoning we set out below, we are unwilling to conclude at this time that a reasonable jury could not find that Plaintiff was retaliated against for seeking FMLA leave. Thus, Plaintiff's FMLA retaliation claim survives summary judgment.

### a.    FMLA Leave Sought

The Third Circuit has made clear that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights *as well as* retaliation against the employee." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) (emphasis added). Therefore, Plaintiff must show only that she requested FMLA leave—she need not show that she actually took the requested leave. *See id.* ("we interpret the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave.")

Plaintiff alleges that she turned in her FMLA paperwork on January 13, 2011, prior to her termination, that at another point in January 2011 she verbally requested medical leave from her supervisors, and that she also requested a modified work schedule at a later date in January 2011. (Thomas Dep. 50-55, 129-130.) Defendant claims that it had a practice of granting FMLA leave

---

[28] Here, as in our "FMLA Interference" discussion, we look at the leave Plaintiff requested in January 2011, and not at her documented request for intermittent leave.

requests, and that there is no reason why a properly presented request would not have been granted. (Oral Arg. *See also* Sherman Dep. at 88.) While we appreciate Defendant's contention that it would have been customary for Bala to have granted Plaintiff's requested FMLA leave had she actually asked for it, we are unable to conclude that there are no genuine issues of material fact regarding whether Plaintiff sought FMLA leave when she alleges that her FMLA forms were turned in before her termination, that she made a separate verbal request for medical leave in January 2011, and that she requested a reduced work schedule in January 2011. In that we have already concluded that a jury could find that Plaintiff provided Defendant with "reasonably adequate" information sufficient to constitute notice of Plaintiff's request for FMLA leave in the context of her interference claim, we apply the same conclusion to this retaliation analysis. Thus, we also conclude that there is sufficient evidence upon which a reasonable jury could find that Plaintiff sought FMLA leave, which prevents us from granting summary judgment on this part of her retaliation claim.[29]

### b.    Adverse Employment Decision

The parties are in agreement that Plaintiff was terminated on February 22, 2011. (Pl. Statement Ex. S.) Therefore, Plaintiff satisfies this prong of her FMLA retaliation claim.

---

[29] We note that Plaintiff's submitted FMLA paperwork alone, and in conjunction with Dr. Kohut's deposition, does not appear to support Plaintiff's argument in that the form requests intermittent leave to secure periodic IV treatments to treat her anemia. We recognize, however, that Plaintiff alleges that she performed an FMLA protected act in submitting the paperwork and that it was, according to Plaintiff, submitted before her termination. (Thomas Dep. at 129-130.) For purposes of this section, we conclude that there is a genuine issue of material fact even if we consider only Plaintiff's testimony that she verbally requested FMLA leave.

### c.      Causal Connection

Defendant alleges that Plaintiff's termination resulted exclusively from her late arrivals to work, and that there was no causal connection between any request for FMLA leave and the termination.  Specifically, Defendant contends that "[e]ven assuming that Ms. Thomas submitted her FMLA forms prior to her discharge[...], and that she was receiving treatment at the time causing her to be late for work[...], her next scheduled appointment that would arguably be FMLA covered was not until February (after her discharge)."  (Def. Mem. at 32.)  Accordingly, in that Defendant lacked any knowledge of even her attempt to exercise FMLA rights, Defendant could not have retaliated against Plaintiff under the FMLA.

By contrast, Plaintiff alleges that she was terminated not just as a result of her submission of her written request for FMLA leave, but also based upon her verbal requests for leave and for a reduced work schedule, all of which occurred in January 2011. We take note of case law cited by Defendant in support of the contention that the temporal proximity in this case may not be not enough to support an inference of a causal connection.  Specifically, in *Capilli v. Whitesell Const. Co.*, 2008 WL 857628, 4 (3d Cir. Apr. 1, 2008), the Third Circuit found that being terminated a period of three weeks after returning from FMLA leave, and a day after requesting further leave, was not enough to establish an inference of causation.  We note, however, that in *Capilli* the plaintiff had displayed performance related deficiencies completely unrelated to her condition (problems interacting with co-workers) prior to requesting and taking leave.  *Id.*  In contrast, the only performance-related deficiencies exhibited by Thomas, her tardiness, could be linked to her anemia.

As pointed out in the above "ADA Retaliation" section, with regard to the question of temporal proximity sufficient to demonstrate a causal connection, "our cases set no parameters but were decided in the context of the particular circumstances before us." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) (concerning a causal connection analysis in a Title VII case). The Third Circuit found in *Kachmar* that a four month period between a protected act and termination could support an inference of retaliation. *Id.* When the record is viewed in the light most favorable to Plaintiff, we conclude that there is sufficient evidence to support her position that the submission of these requests were sufficiently connected to her termination to support an FMLA retaliation claim. We are unwilling to say that the retaliation claim should be precluded as a matter of law based on this evidence.

### d.    Pretext

To demonstrate pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Atchison*, 666 F.Supp.2d at 494 (citing *Fuentes*, 32 F.3d at 764). For substantially the same reasons discussed under the pretext analysis of Plaintiff's ADA retaliation claim, we conclude that a jury could reasonably believe that Defendant had a discriminatory reason that motivated the decision to terminate her.

## V.  CONCLUSION

For the reasons set out above, we conclude that Defendant's assertions do not warrant granting summary judgment, as there are genuine disputes of material fact regarding each of Plaintiff's claims.

An appropriate order follows.